# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3551

_____

United States of America

*Plaintiff - Appellee*

v.

James Hess

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: April 15, 2016
Filed: July 18, 2016

_____

Before RILEY, Chief Judge, WOLLMAN and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Taxidermist James Hess pled guilty to one count of Lacey Act Trafficking in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1)(B) for his involvement in the purchase and sale of a pair of black rhinoceros horns. The district court[1] sentenced

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

Hess to 27 months imprisonment, which Hess appeals, alleging the district court procedurally erred and imposed an unreasonable sentence. Having appellate jurisdiction under 28 U.S.C. § 1291, we affirm the judgment of the district court.

## I.  BACKGROUND

This case arises out of the United States Fish and Wildlife Service's investigation into illegal trafficking of rhinoceros horns and ivory—Operation Crash.[2] Operation Crash led investigators to Felix Kha, who was smuggling rhinoceros horns out of California to buyers in Taiwan and China, where the horns have the highest market value. James Hess operated a taxidermy business out of his home in Maquoketa, Iowa, since 2000, and sold wildlife items to Kha. Wade Steffen often worked as an agent for Kha and traveled throughout the United States to make purchases on Kha's behalf.

According to a U.S. Fish and Wildlife Service special agent who testified at Hess's sentencing, Hess agreed to sell a pair of black rhinoceros horns to Steffen in April 2011.[3] Hess transported the horns from Iowa to Illinois. In Illinois, Hess sold the horns to Steffen for $40,000. Steffen shipped the horns to Kha in California.

In August of that year, Hess responded to an online advertisement for a pair of black rhinoceros horns from a seller residing in Oregon. Hess indicated to the seller he intended to sell the horns to an Oregon resident. Hess unsuccessfully tried to sell the horns and later contacted Steffen to see if he was interested in buying another pair of black rhinoceros horns. Hess and Steffen agreed Hess would purchase the horns

[2]"Crash" is a term used to describe a herd of rhinoceroses.

[3]The black rhinoceros is listed as an endangered species under the Endangered Species Act. See 16 U.S.C. § 1533(a)(1), (c)(1); 50 C.F.R. § 17.11(h). It is also protected under the Convention on International Trade in Endangered Species of Wild Fauna and Flora.

from the seller in Oregon, Steffen would sell the horns, and the two would split the profit of the sale.

Hess traveled to Illinois, where Steffen gave him $17,000 to make the purchase. On August 23, 2011, Hess flew to Oregon and met with the seller of the advertised horns. Hess showed the seller a copy of an Oregon driver's license supposedly belonging to the in-state buyer for whom Hess was making the purchase. Hess purchased the horns for $16,000 and shipped them to his Iowa home. After the horns arrived, Hess and Steffen met in Davenport, Iowa, where Steffen paid Hess half of the profit he believed they would make on the sale of the horns. Steffen then sold the horns to Kha for $50,000.[4]

Hess eventually came to the attention of the Operation Crash investigation and was arrested. Based on the August 2011 transaction, Hess was charged with one count of Lacey Act Trafficking, see 16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B), for knowingly engaging in conduct involving the sale and purchase of wildlife with a market value exceeding $350 that was transported and sold in violation of the Endangered Species Act, 16 U.S.C. §§ 1538(a)(1)(E), (F), and 1540(b). In May 2015, Hess waived his right to a prosecution by indictment. He pled guilty on May 13, 2015. Hess and the government stipulated to a twelve-level enhancement to Hess's offense level under the United States Sentencing Guidelines (U.S.S.G. or Guidelines) to account for the market value of the horns, which they agreed was between $200,000 and $400,000.[5] See U.S.S.G. §§ 2B1.1(b)(1)(G), 2Q2.1(b)(3)(A) (2014).

---

[4]Hess claims he was unaware Steffen intended to sell the horns to Kha. Hess also objected to the sale price and market value of the horns set forth in the presentence investigation report, but later agreed with the government about their market value.

[5]Hess's charge was based solely on the August 2011 transaction, and he disputed the relevance of the April 2011 transaction before the district court. Based on the agreed upon market value, even if the district court had decided to consider the

Before sentencing, Hess and the government agreed the applicable advisory Guidelines range was 27 to 33 months imprisonment (offense level 17, category II). Hess moved for a downward variance, requesting probation, which the government opposed. At sentencing, the district court denied Hess's request and sentenced him to 27 months in prison followed by three years of supervised release. Hess appeals.

## II. DISCUSSION

Hess first argues the district court made an "unsustainable finding on the record presented" when it stated: "In general terms, no, Mr. Hess did not go to Africa and poach a black rhino. But by his actions, he helped establish a market for these black rhino horns, and that is a serious offense against the planet." Because Hess did not object to the district court's statement during sentencing, we review this issue for plain error. See United States v. Black, 670 F.3d 877, 881 (8th Cir. 2012).

Hess claims the district court's statement was "based on speculation" because the record does not demonstrate his actions "support[ed] a 'market' for poached black rhino horns." In Hess's view, because the horns he purchased in Oregon were first acquired legally in 1957, he "did not contribute to a market or demand for *poached* black rhino horns." During sentencing, the government called a special agent with the U.S. Fish and Wildlife Service who explained how the "skyrocketing price" being paid for rhinoceros horns has "fuel[ed] a huge market in the home countries for the rhinos in Africa," contributing to and increasing "the poaching epidemic." See, e.g., United States v. Bernal, 90 F.3d 465, 467 (11th Cir. 1996) (per curiam) ("The purpose of the Lacey Act is to protect 'those species of fish and wildlife whose continued existence is presently threatened' by 'gradually drying up the international market for endangered species,' thus 'reducing the poaching of any such species in the country

April 2011 transaction as relevant and include its value in the total market value, Hess's offense level under the Guidelines would have remained unaffected because the total market value would still not have exceeded $400,000. See U.S.S.G. §§ 2B1.1(b)(1)(G), 2Q2.1(b)(3)(A) (2014).

where it is found.'" (quoting S. Rep. No. 91-526, as reprinted in 1969 U.S.C.C.A.N. 1413, 1415-16)). The record supports the district court's statement that Hess's actions contributed to establishing and furthering a market for black rhinoceros horns. Using false identification, Hess purchased a pair of black rhinoceros horns and shipped the horns across the country—knowing they would be resold. The district court did not plainly err.

Hess also argues, "[g]iven [his] acceptance of responsibility, his limited criminal history, and the more lenient sentences for [other] individuals prosecuted as part of Operation Crash," the district court imposed an unreasonable sentence and failed to satisfy the sentencing goals under 18 U.S.C. § 3553(a). We review the substantive reasonableness of a sentence for an abuse of discretion, affording a sentence "within the Guidelines range . . . a presumption of reasonableness." Gall v. United States, 552 U.S. 38, 51 (2007); see United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc).

The district court thoroughly considered Hess's criminal history and the effect the sentence would have on Hess's relationship with his son, disagreeing with Hess's proposition that he is not a "repeat offender." The district court "carefully considered" the § 3553(a) factors, stating the sentence must "reflect the seriousness of the offense, . . . promote respect for the law, be a just punishment, afford adequate deterrence . . . , protect the public . . . , [and] provide the defendant with needed education . . . or other correctional treatment." See 18 U.S.C. § 3553(a)(1), (2). Responding to Hess's argument that other individuals prosecuted through Operation Crash received more lenient sentences, the district court explained it could not "speculate why judges in different judicial districts across the country decided on a particular disposition for a particular defendant."

Having reviewed the sentencing transcript, we conclude Hess has failed to overcome the presumption of reasonableness we apply to his bottom of the advisory

Guidelines range sentence.  See Gall, 552 U.S. at 51.  "'[T]he court carefully explained the reasons for its sentence and its refusal to vary downward, and we see no indication that the court improperly weighed the sentencing factors.'"  United States v. Harlan, 815 F.3d 1100, 1107 (8th Cir. 2016) (alteration in original) (quoting United States v. Wanna, 744 F.3d 584, 589 (8th Cir. 2014)).

## III.   CONCLUSION

Finding no error, we affirm.

_____